I'm sorry. The next case on the docket is In Re Commitment of Johnny Gibson, 518-0156. Do you prefer to be called Ms. Clark Strong or Ms. Strong? Either is fine. Okay. Well, under either you are. Begin when you're ready. May I please report, counsel? I'm Paige Strong and I represent Johnny Gibson in this matter. Out of some sort of habit, I struggle with referring to him as a respondent all of the time. It's in the habit of saying defendant if I mix that up. I'm still talking about the same guy. In this case, we have two issues. This was an initial commitment proceeding where the state sought to have Mr. Gibson committed as a sexually violent person under the SCP Act. They asked that he be committed to Rushville, to the treatment detention facility, and ultimately that's what happened. I raised two issues in this case. I do want to focus mostly on the second one because it's the most unique and the more interesting. The first issue, though, is a reasonable doubt issue. We hear those all the time. We know how they work. In this case, what the state has to prove in order to commit Mr. Gibson as a sexually violent person is that he has been convicted of a sexually violent offense, that he suffers from a mental disorder, and that he is substantially probable to engage in acts of future sexual violence. At trial, we had no dispute over the fact that he has a prior qualifying conviction. He did have a conviction for predatory criminal sexual assault. Our second issue and our third element were in dispute. There was a lot of evidence presented about whether he suffered from pedophilic disorder, what that means, what the qualifiers are. Two state experts testified that he did. The defense expert disagreed strongly. Part of the disagreement on that issue was that in order to be diagnosed with pedophilic disorder, a person has to demonstrate symptoms over a period of six months, and he has to be at least 16 years old. So while Mr. Gibson had some juvenile misconduct, that can't be considered when determining whether or not a diagnosis of pedophilic disorder is appropriate. What can be considered is the offense that he pled guilty to at age 21, and then we need a second event. We need something else that covers that six-month period before that's a legit diagnosis. So the dispute between the state experts and Dr. Rozell, the defense expert, was whether there was ever a second situation that would qualify him. The state experts believe that it did because they believe the additional actions were the fact that Mr. Gibson told some evaluator that he masturbates to fantasies of that offense when he was 21, that he admitted he committed when he was 21. There was no additional, like, follow-up with Mr. Gibson by those evaluators to determine how frequent, when, how intense are these fantasies. Nothing further went into that. Now, he never told Dr. Rozell that. He never told Dr. Rozell in his evaluation that he had fantasies and that he masturbated to them. So when Dr. Rozell was asked on cross-examination, if he had told you that, would that change your opinion? And Dr. Rozell, as a professional non-iron gun, said, absolutely, it could have changed my opinion, but it didn't happen. He didn't tell me that. And then I would have needed more information than what these other evaluators have testified to and put into their reports. I would have had to have delved deep into what is frequent, what is intense, so much more detail than just check the box and move on. So his testimony still was that he would not diagnose him with pedophilic disorder. So there was dispute on that element. The third element about substantially likely to reoffend, there was much more dispute about. They talked about the static 99R results, which all three evaluators got the same numbers. They just interpreted them differently. Dr. Rozell relied on the fact that for a 7-year period, there's no indication that Mr. Gibson ever committed an offense while he was out in the world. Well, he reoffended, though, after he had received some treatment. Yes, he did. It's tough to reoffend when you're in prison. The 7-year period that we're talking about, he was not necessarily in prison that whole time. The treatment that he did, that he did receive, frankly, he was a junior high age boy. He was admitted and he did not really do the work in treatment, and he wasn't a participant for very long. That was part of a probation thing that happened in a juvenile case. And there were not very many practitioners. The quality of that treatment, nobody can really know because there aren't any records about it to speak of. But the defense expert, didn't he also say that there was a risk of reoffending? And between the experts, it was a matter of how much the risk was? Yes, absolutely. Dr. Rozell's testimony is generally, and I can't point to the page on which he says it, there's always a risk of reoffending by everyone because everyone has independent will. He compares, he uses the static line. So when you commit a crime of that kind of severity, isn't the risk of reoffending really what needs to be looked at in the conduct of this gentleman? Absolutely, 100%. And was there testimony that he still had fantasies about the offense for which he was convicted? There was testimony from the true state evaluators that he had made that comment to them, but they had no additional information because they hadn't furthered that. They hadn't furthered the conversation with him to find out the details or the information. Dr. Rozell, did the defense expert ask that question? He talked to him about his habits, but he specifically testified that Mr. Gibson never told him that he masturbated to those fantasies. So he didn't have that information, but then acknowledged had he told him that or had he been aware, it could potentially change his opinion. But before that happened, he would have to have more information about frequency, intensity, and what have you. So before I was lucky enough to get onto this court and somebody said, well, you never told me, my response was always, did you ask? Of course. Did your expert ask the question? No, he must not have, or he wouldn't have had that information. He never asked about the offense for which he was incarcerated. Oh, he absolutely talked to him about that offense, absolutely. I'm talking about the additional, the disputed information about the fantasies and the masturbation. That's the part that wasn't, that information was not given to all players at all. So that is something that Dr. Rozell focused on, though. One thing that this man does that is different from the thousand other sex offenders that he has evaluated is that to this day he will tell you things that nobody knew about. He'll confess things that no one knew. That's not, in Dr. Rozell's opinion, the sign of a person who is intent on reoffending. This is a man who admits what he's done, who is extremely remorseful for what he did, not like the other 1,000 people that Dr. Rozell has evaluated. How can you say that admitting something is a sign of remorse? How do those two equate? I'm not the one who says it. What's that? I'm not the one who says that. I'm saying that that is part of the treatment at the SVP program, that before they can be considered to be making any progress, part of which is remorse, is they have to accept responsibility. Well, I agree with that. It has to be a part of that. You have to first admit it before you can be sorry. But admitting it doesn't make you sorry. I may have misled you when I said those, combined those things like that. Dr. Rozell has an opinion that he is different than other sex offenders, one, because he's remorseful, and two, because he continues to admit things. Those are separate issues. What evidence is there of remorse? I'll tell you. When he was 21 years old, he told his girlfriend, I think I have a problem. Help me. Keep me away from children. I've done something. I did something, and he told her what he'd done. He also had, prior to that, gone to his mother and said, I need help. I did something. I need help. And he was very remorseful. He cried about it. You never go to the victim and say, I'm sorry. That's remorse. Saying you need help is a personal thing.  My understanding, and I could be wrong about this because it has been, I believe, three years since trial, and, frankly, I don't remember discussing. My opinion, my recollection, is that he wouldn't have had access to her. She wasn't someone in his circle. Wasn't someone he would have been around. So I don't know if that ever would have been a possibility. Those are the issues. Was there a problem with regard to any of his victims? Yes, he has. In fact, he has. Whether that, I'm thinking. Prior to the trial or prior to his evaluation? Yes. He hadn't expressed remorse? Yes. Specifically in the hearings? I'm thinking of an incident that I don't know if that came out at trial. That's why I don't want to say any more about it. I immediately had a response to it that I don't think it's part of the trial. Those were the reasons why Dr. Roselle had a different opinion about substantial likelihood to re-offend. It's not just because he offended once. We don't automatically assume he will again. He found a difference in this defendant than he did in many of the other people he evaluated. And that's why his opinion differed on that. He was the only one who could give you hard numbers. Both state experts would reference he is 1.94 more times likely to re-offend than the average sex offender. But never threw out a number about how likely it is the average sex offender will re-offend. The only one who did that was Dr. Roselle. He was the only one who could give you hard numbers about what the likelihood is, at least as hard a number as you can when we're talking about projected speculative events. He wasn't talking in abstract terms like, you know, more than the average guy. What's that mean to anybody? What can it possibly mean to a juror if they don't have a number by which to reference that? So I've got to develop a reasonable doubt to talk about what happened in closing argument. In closing argument, the Attorney General got ahead of himself and he referred to Mr. Gibson as a rapist. I have a question. I'm going to give you an extra minute. There was no objection made. That's correct. There was not. What about the issue of forfeiture there? It's plain error. It's plain error. The argument there is plain error. Yes, and absolutely an objection should have been made. It was included in the post-trial motion. Frankly, it happened so fast. So it was included in the post-trial motion, and, you know, certainly ineffective assistance that it wasn't objected to. And it's made on the ineffective one. I caught it too late to object. The argument was over like that. Okay. I'm going to let you stop there, and you'll have a chance to finish. Thank you. Okay. Thank you. Is it Mr. Miller? Mueller. Mueller. Okay, Mr. Mueller. May it please the Court. Closing counsel. I am Assistant Attorney General Nick Mueller for the people. Now the two claims before the Court, one of whether the evidence was sufficient to find the respondent a sexually violent person, and the other whether the prosecutor's arguments were improper and erroneous, they're both governed by the same set of facts, and that's that the evidence in this case was so compelling and so plentiful that neither claim can succeed. So turning the sufficiency claim first. Largely what the respondent has raised is a credibility contest between the two experts and this question of numbers. The appellate court in both cases has said those are not cases that can succeed in a sufficiency claim. If it comes down to credibility, that is not enough to find the evidence insufficient, and that's because the question is taking the light in the evidence, taking the evidence in the light most favorable to the State, could a rational fact finder have found the respondent to be a sexually violent person? Now there's been no claim that there wasn't proof of the first element, there was a sexually violent offense. And as to the other two problems, whether a respondent had a mental disorder and whether that disorder made him substantially probable to reoffend, the jury had two experts to rely on. And in the sufficiency claim, we don't need to look to respondent's expert. This is an issue of were the State's experts supported by enough evidence that the jury could find them credible? And they could. Both experts spoke to respondent, they reviewed his record, and using their medical judgment found him to suffer from a pedophilic disorder. They also used actuarial tables, fully used in their practice and used frequently, to show that he had a high risk of reoffending. Now because they had evidence to back those two elements up, there was nothing wrong with the jury. The rational jury defined that they were credible and to accept their diagnoses and their opinions over that of respondent's experts. Now, the strength of evidence also comes up in regards to this question of were the State's arguments in closing inconsequential? Were they so prejudicial that they are error? Now, if this had been objected to, the State... Well, you kind of combined things there. The first question is was there error, right? Yes, Your Honor. And if I may... Actually, in this case, Your Honor, there's a bit of a specialness to an argument, to a claim that closing argument is erroneous because part of determining whether it's erroneous is a prejudicial element. And so... Which comes first? I don't... Do we have to determine prejudice first? Do we ever reach the issue of prejudice if we don't find error? No, Your Honor, but in the same context, if it's so clearly unprejudicial, courts are not required to pass on whether the comments themselves were proper. And... Well, what do you think about the comment? Do you think it was error? Your Honor, I think it was a fleeting comment. As opposing counsel said just a minute ago, it happened so fast she could not object. The jury was then instructed that closing arguments were not evidence. And counsel was responding to the entire theme of opposing counsel's case, this idea that the state's experts did not have evidence backing up their saying. And what this counsel was saying was there was an event in the past that with the same victim, the respondent then admitted to abusing. When you look at these together, that provides some history to support a pedophilic disorder. There was also admissions of the fact that the respondent was still masturbating to both fantasies of that victim and prior victims from when he was younger. And so while there may have been sarcasm or invectiveness in the state's comments, that's allowed in some points. But the question here is not whether or not it was the best practice or the best argument the state could have made, because in the end the only way it can be erroneous is if it was so prejudicial that it became a material factor in the verdict. And on top of that, it was not objected to during the trial. So that means we add plain error analysis on top of that already existing prejudicial prong. The state maintains that because sexual commitment proceedings are a civil proceeding, the civil plain error test should govern. However, we acknowledge that the court has, the appellate court, not the Supreme Court, has stated that the criminal plain error doctrine applies, and I understand it in this case. There can't be a finding prejudiced enough to overcome the verdict. Now, the reason respondent wasn't prejudiced, as I already said, is that, as a brief reference, it was just the use of the word rape, and it was not an extended going into the graphic details of any acts. And the jury was then instructed that closing arguments are not evidence. Now, that is not all it is, because the evidence also wasn't closely balanced. You have three experts. How can you say it's not closely balanced if you argue credibility? If something comes down to the credibility of expert witnesses, isn't it by definition closely balanced, or can you say that one expert is so far out that it's really not a credibility argument? I think you can make that argument, Your Honor. I think part of the issue is with saying credibility determination is just off limits is part of this efficiency process, and it kind of is getting conflated, and I believe it was conflated in briefs, with whether the evidence was closely balanced. But on the other hand, it's not just closely balanced. It's been so closely balanced that the error itself would have made the error itself threatened to the scale of justice. But what we have here wasn't just a credibility contest in the sense that one expert says A and one expert says B. The State had two experts. These experts relied on Respondent's admissions. They relied on his actions. As to the diagnosis, Respondent's expert said, you know what, the State's experts, they make an arguable diagnosis. And then he admitted that he hadn't heard the same admissions that the State's experts had. If he had heard the admissions, the Respondent was still masturbating to his fantasies of the offenses. He said it's possible he might have diagnosed Respondent with pedophilic disorder. So it's not a basic credibility contest of two experts equally informed. You have two State's experts who are fully informed. They are well aware of Respondent's admissions. And then you have Respondent's expert who wasn't informed, who possibly didn't ask the questions to find out that Respondent was still masturbating to his pedophilic desires. And that's an important fact to keep in mind when diagnosing a Respondent with pedophilic disorder. Dr. Rozelle, while he made whether to ask questions or not, was not fully informed. He also did something different than the State's experts when it came to the determination of whether Respondent was substantially probable to re-offend. Both the State's experts took the actuarial tests, and they used them in the fashion put forth by the test's inventors. The inventors say the best way to look at these tests is to say it is relative, to say a Respondent is X times more likely than the average sex offender. People who have made the tests don't believe it is appropriate to say there is a 4 to 5 percent chance, like Dr. Rozelle did, that this particular person will re-offend. And the reason that's the case is because you have to look at what the actuarial tests are. They are baseline tests to say people like Respondent who answer this questionnaire, I'm sorry, not a questionnaire, who meet these static factors the same way Respondent does, they have about this amount of chance of re-offending. In Respondent's case, that was about 5 times more likely than the average offender. What the State's experts then did was they took into effect dynamic factors that were particular to Respondent. Those include the fact that he's been in treatment before. It didn't work. He was kicked out of treatment twice as an adult in the prison system. All these factors taken together show whether or not Respondent's remorseful, whether or not he admits to his desires, he has been unable to control himself, and he's substantially likely or substantially probable to re-offend in the future. So unless there are any further questions, we ask that this Court confirm the judgment of the trial court. Thank you. Thank you. Thank you, counsel. Justice Gorsuch, did you have anything? No. Okay. Okay. Ms. Strunk, did your expert do an evaluation of these static tests? He did. And he found that he was likely to re-offend, didn't he? No. What he, so the beauty of the static 99 test and all the static tests is that it's not about this Defendant. It's about people who score like him. So everyone who has a 4, like Mr. Gibson did, is going to have the same general relative risk. Obviously, they're not all the same person. But what did Defendant's relative risk show, expert? What did Defendant's expert relative risk show? Okay. He did not disagree with the 1.94 times the average sex offender, but he's the one who told what the rate of an average sex offender's recidivism is, 8%. Okay. But he did do the same test as the other two experts, and they arrived at about the same number. The difference being this expert, Dr. Roosevelt. The interpretation of it. Yes, the interpretation. And his interpretation is that it doesn't approach substantially likely. Now, every doctor is going to consider something in addition to the actual number that comes up on the test. State experts are always going to add in what they consider aggravating factors, and they're always going to testify that they believe the numbers on the actuaries underestimate risk. And so they give you a list of all these other things that make it worse. Dr. Roosevelt testified to things that make him less likely than the numbers would suggest, one being no indication that there was any misconduct between age 14 and 21. Then when he was in prison for 10 years, not a single instance of sexual acting up, which Dr. Roosevelt testified to is, well, it seems like one doesn't offend. They don't offend against children in prison. It doesn't mean they don't offend. It happens all the time. What about his failure to progress in the treatment programs? Well, when he was in the initial treatment program, he was involved in a short period of time based on, well, he wasn't good at it, for one. He wasn't committed by any sort. I'm talking about in the prison system. While in the prison system himself, he still wasn't great at it. It is true that not every DOC facility offers treatment, and I don't remember the specifics of where he was. He was not in the same facility the entire time. He transferred some. But, no, he was not successful. No, he didn't do great, or we would have presented a lot of testimony about that. That is part of the concern, at least. But despite that, he still didn't have any other offenses. Even while in prison, it happens. It didn't happen in his case. Those are the other factors that Dr. Roosevelt looked at to say that he does not find him to be substantially likely to reoffend, and even considering the state's opinions about what those numbers mean, still not, in Roosevelt's opinion, substantially likely to commit future acts. So they came to a completely different conclusion there. So I wanted to talk, since I didn't get to talk about it earlier, about the comments in closing. I did acknowledge that it happened so quickly I didn't have the opportunity to object to it, and I knew when I said it that he was going to bring it up. The difference is my ability to calculate all of that, get an objection done before that attorney general sat down, has no correlation to the impact the word rape has on the mind of a juror. There's a reason we don't use that word in Illinois anymore. It has a horrendous connotation. And it sounded to me like the state just argued that because I put on a defense, essentially we asked for it, so we can throw out all the rules about the state having to play fair ball. That's not what it means. He can comment all day long about how our defense was insufficient and shouldn't persuade the jurors. That doesn't mean you get to pull out magic hammer words like rape. Those aren't nice. They mean things to jurors. They're a big deal, and it was completely unnecessary. And I believe that if the state didn't believe it was important or would have impact, they would not have said it. So it's disingenuous to now argue, oh, well, it doesn't mean anything. That word doesn't mean anything. If it didn't mean it, you shouldn't have brought it. Not one like that. Not in a case like this. And as John pointed out, there's no genuine way to argue that evidence is not closely balanced when we're talking about which expert of the three do you believe. It also – I shouldn't even have to point out that the fact that they have two state experts and I have one does not mean they automatically win. If that's the case, let's not even have trials. Let's just have two state experts and not go to the courthouse. That's not what it's about. It has to be credibility determination. When there is a credibility call, like which of these experts is the most persuasive, which one did the most thorough job, which one do we believe? That's the definition of closely balanced. And when you throw words like rape in there, you start tipping the scales. This isn't a case where we sat there with no defense and just took what the state handed out. It's not. It was prejudicial. We'd ask for a new trial. Thank you. Thank you very much. We're going to take this matter under advice. Thank you. Thank you. Of course. Thank you so much.